# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA KADO, | ) | CASE NO. 1:15CV2044 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Melissa Kado ("Plaintiff" or " Kado"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In October 2012, Kado filed applications for POD, DIB, and SSI, alleging a disability

onset date of October 1, 2008 and claiming she was disabled due to "clavical removal, screws

and plates in neck, bipolar, fibromyalgia, and depression."  (Transcript ("Tr.") 12, 125, 137.)

The applications were denied initially and upon reconsideration, and Kado requested a hearing

before an administrative law judge ("ALJ").  (*Id.*)

On May 13, 2014, an ALJ held a hearing, during which Kado, represented by counsel,

and an impartial vocational expert ("VE") testified.  (Tr. 28-82.)  On July 2, 2014, the ALJ

issued a written decision finding Kado was not disabled.  (Tr. 12-22.)  The ALJ' s decision

became final on August 13, 2015, when the Appeals Council declined further review.  (Tr. 4-6.)

On October 2, 2015, Kado filed her complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 13, 14.)

Kado asserts the following assignments of error:

> (1)   The ALJ failed to incorporate all of Ms. Kado's mental health limitations in
> the mental residual functional capacity.  Specifically, the ALJ failed to fully
> account for Ms. Kado's moderate limitations in her ability to concentrate, persist,
> and keep pace despite the ALJ's acknowledgment that such limitations exist.

> (2)   The ALJ did not evaluate Ms. Kado's subjective complaints of pain under
> the judicially created *Duncan* test.  This was more than mere harmless error
> because of the nature of the severe impairments such as fibromyalgia and other
> traditional pain inducing impairments.

(Doc. No. 12.)

## II.   EVIDENCE

## A.   Personal and Vocational Evidence

Kado was born in December 1981 and was thirty-two (32) years-old at the time of her

administrative hearing, making her a "younger" person under social security regulations.  (Tr.

21, 125.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has a limited education and is able to

communicate in English.  (*Id.*)  She has past work as a cashier, retail sales attendant,

2

cleaner/housekeeper, and childcare worker.  (Tr. 69-70.)

**B.     Medical Evidence**

   **1.       Mental Impairments**

The first mention in the medical record regarding Kado's mental health impairments appears to be in the treatment notes of Kado's primary care physician, Mourad El-Gazzar, M.D.[1] On April 15, 2009, Kado presented to Dr. El-Gazzar for treatment of cervical and upper chest wall pain.  In connection with his examination, Dr. El-Gazzar noted Kado was "depressed, unable to focus," and experiencing poor sleep and feelings of hopelessness.  (Tr. 415.)  Dr. El-Gazzar diagnosed depression, but does not appear to have suggested any specific treatment or prescribed medication at that time.  (*Id*.)

Kado presented to Dr. El-Gazzar on five occasions between April 2009 and November 2010 for treatment of various conditions, but did not report feeling depressed or anxious other than at the April 2009 visit described above.  (Tr. 400-412.)  In February 2011, Kado complained of depression, stating she felt "hopeless and helpless."  (Tr. 397.)  Several months later, in May 2011, Dr. El-Gazzar noted Kado had been diagnosed with depression and was taking Lexapro for that condition.  (Tr. 393.)  On that particular date, however, Kado did not present with any depressive symptoms and was described as having an appropriate affect and demeanor, normal speech pattern, and normal thought and perception.  (Tr. 394.)

During visits in July and October 2011, Dr. El-Gazzar noted Kado's history of depression

---

[1] Although not addressed by the parties, the Court notes that Kado's school records indicate she was in special education classes and had an Individualized Education Plan ("IEP") throughout her school years.  (Tr. 462- 542.)  Additionally, these records indicate Kado underwent intelligence testing on several occasions and showed full scale IQs of 83, 87, and 91.  (Tr. 155, 475, 480, 496, 506, 513, 533.)

and treatment with Lexapro.  (Tr.  390-392, 387-389.)  Again, however, examination revealed normal results.  (*Id*.)  In July 2011, for example, Dr. El-Gazzar noted Kado "is doing well without any significant affective symptoms."  (Tr. 390.)  Further, in October 2011, Dr. El-Gazzar's treatment notes expressly state Kado was "negative for anxiety, depression, and sleep disturbances."  (Tr. 387.)

In December 2011, Kado presented to Dr. El-Gazzar with a depressed affect/demeanor, as well as a slow speech pattern and "paucity of language."  (Tr. 386.)  Dr. El-Gazzar noted Kado's continued use of Lexapro and described her depression as "controlled."  (Tr. 385.)  Dr. El-Gazzar's treatment notes from January and March 2012 again described Kado's depression as controlled.  (Tr. 380, 382.)

In April 2012, Kado appears to have been incarcerated for a probation violation.  (Tr. 362.)  During an initial health screening with the Cuyahoga County Sheriff's Office, Kado reported she had bipolar disorder but was not taking medication.  (Tr. 360.)  In answer to the question "have you ever tried to kill yourself or done harm to yourself," Kado stated she was "thinking about it right now."  (*Id*.)  Kado was thereafter admitted to the mental health unit and placed under suicide precautions.  (Tr.  364.)  On April 30, 2012, psychiatrist L. Koblentz, M.D., conducted an initial psychiatric evaluation, at which time Kado indicated she never intended to kill herself and was "just angry."  (Tr. 365.)  Dr. Koblentz assessed adjustment disorder, discontinued suicide precautions, and referred Kado to the general population.  (*Id*.)

Subsequently, on August 4, 2012, Kado presented to the emergency room complaining of depression and suicidal thoughts.  (Tr. 451.)  Examination revealed disheveled appearance, increased psychomotor activity, and a tearful and agitated mood.  (Tr. 452.)  The attending

4

physician noted suicidal ideation, evidence of self-harming, and poor insight and judgment.  (*Id*.)  Treatment notes also reflect cocaine and ETOH abuse.  (Tr. 452-453.)  The record contains an application for emergency hospitalization on the grounds Kado "represents a substantial risk of physical harm to [her]self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm."  (Tr. 454.)  It is unclear, however, whether Kado actually received inpatient psychiatric treatment at this time.

In September 2012, Kado presented for treatment at the Southwest Center for Families and Children.  (Tr. 427.)  The treatment provider (whose name is illegible) noted Kado "continued to [complain of] severe depression and related symptoms," as well as moderate anxiety.  (*Id*.)  Kado also stated she had discontinued Cymbalta due to "sedation."  (*Id*.)  Examination revealed a depressed and flat affect, but good eye contact, logical/clear thought process, cooperative behavior, fair cognition, and good insight/judgment.  (*Id*.)  Kado was assessed with depression and anxiety, and prescribed Wellbutrin.  (*Id*.)  The record reflects Kado was a "no show" for a follow-up appointment in October 2012, and was discharged from treatment in December 2012 after failing to contact the Center or schedule an appointment.  (Tr. 428-429.)

Kado was apparently incarcerated again in February 2013.  (Tr. 600.)  She underwent mental health screenings on February 6th and 18th, 2013, at which time she was described as oriented to person, place, date, and situation with cooperative behavior, calm mood, appropriate speech, and logical thought process.  (Tr. 607, 609.)  During an initial psychiatric evaluation on February 23, 2013, Kado reported suffering from "bipolar, depression, and anxiety."  (Tr. 606.)  She reported crying spells and a lack of energy and motivation, but denied suicidal ideation.

5

(*Id*.)  Examination revealed clear and coherent thoughts, good eye contact, and normal speech.

(*Id*.)  Kado was assessed with depression and substance abuse, and prescribed Celexa.  (*Id*.)

Records also indicate she was prescribed Xanax and Klonopin during her incarceration.  (Tr.

602, 605.)

On April 4, 2013, Kado was brought to the emergency room for a possible motrin

overdose.  (Tr. 547.)  She was highly intoxicated and "had a knife and was cutting and

threatening to stab self."  (*Id*.)  Lab results revealed renal failure and a urinary tract infection.

(Tr. 577.)  Kado was transferred to the intensive care unit for treatment of her renal failure, and

put on suicide precautions after evaluation by a psychiatric certified nurse practitioner.  (*Id*.)

 (*Id*.)

On April 8, 2013, Kado was transferred from the hospital to an inpatient facility for

psychiatric treatment.  (Tr. 577.)  She was started on Celexa and Risperdal, and discharged three

days later, on April 11, 2013.  (Tr. 577-578.)  At that time, she was described as "more euthymic,

with brighter affect," improved eye contact, fluent speech, and improved insight and judgment.

(Tr. 578.)  Kado was diagnosed with "mood disorder not otherwise specified, rule out bipolar,

depressed, EtoH dependence rule out EtoH-induced mood disorder."  (Tr. 578.)  She was

assessed a Global Assessment of Functioning ("GAF") of 55-60, indicating moderate

symptoms.[2]

---

[2] The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A GAF score between 51 and 60
indicates moderate symptoms or moderate difficulty in social, occupational, or
school functioning.  A recent update of the DSM eliminated the GAF scale
because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders*

### 2.      Physical Impairments

The record reflects Kado has a long history of problems with her right clavicle.  In December 2008, she was referred to orthopaedist William Seitz, Jr., M.D., for a consultation regarding ongoing severe pain involving her right shoulder.  (Tr. 612.)  Dr. Seitz summarized her medical history regarding this issue as follows:

> Patient has had multiple surgical procedures on the right clavicle dating back 6 years.  She sustained a fracture.  Did not heal with figure-of-eight immobilization and has undergone multiple attempts at repair.  She had a plate and screw fixation and the plate was removed and apparently there was incomplete union and the patient developed a frank nonunion.  She has had multiple surgeries by Dr. Billfield.  When the plate became infected it was removed.  She has had insertion of bone stimulators and it still has not healed.  She has a segment about an inch wide in the middle portion of her clavicle which has failed to heal.  This is extremely tender and sensitive even to superficial touch.  There is a large scar on this area.  Despite this, she has surprisingly good shoulder mobility with total elevation to 160 degrees, external rotation to 50 degrees, and internal rotation to T10.  Distal sensation, circulation, motor function are all within normal limits.  No signs of any cervical radiculopathy or brachial plexopathy at this point in time.

(Tr. 612.)  Dr. Seitz assessed "an atrophic nonunion fracture of the right clavicle with a large segmental defect."  (*Id*.)  After discussion with Dr. Seitz, Kado elected to proceed with surgery, including a "subtotal claviculectomy, debridement of scar tissue, and removal of painful scar and neuroma."  (*Id*.)

Kado underwent surgery on February 11, 2009.  (Tr. 613.)  During a follow-up appointment on March 3, 2009, Dr. Seitz noted the excision was healing well.  (Tr. 615.)  He observed Kado had "surprisingly good mobility early with active elevation up to about 150 degrees."  (*Id*.)  Dr. Seitz recommended anti-inflammatory medications, and progressive

---

(DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

7

exercises.  (*Id.*)

In May 2009, Kado continued to be "healing well" and her preoperative pain was "much diminished."  (Tr. 616.)  By August 2009, Kado had "regained essentially full range of motion [and] near-normal strength."  (Tr. 617.)  In November 2009, however, Kado complained of a "sense of weakness and that the shoulder is giving out."  (Tr. 618.)  Dr. Seitz found that "overall, her shoulder function is quite good as is her strength," but that "it would appear she simply has very sensitive nerve endings."  (*Id.*)  He recommended she seek pain management consultation. (*Id.*)

Meanwhile, Kado presented to Dr. El-Gazzar throughout 2009 and 2010 with various pain complaints.  In April 2009, Kado reported cervical and upper chest wall pain, as well as neck pain radiating to the bilateral upper extremities and shoulders.  (Tr. 415.)  Dr. El-Gazzar stated Kado's cervical pain was "controlled with Vicoprofen" and that she was "having physical therapy with good response."  (*Id.*)  In October 2009, Kado complained of shoulder, neck, and lower back pain.  (Tr. 412.)  She reported stiffness in both her neck and back, and difficulty bending.  (*Id.*)  Dr. El-Gazzar ordered x-rays of Kado's lumbar and cervical spines, and prescribed Vicodin and Soma.  (*Id.*)

Kado presented to Dr. El-Gazzar on four occasions in 2010 with similar pain complaints. (Tr. 400-411.)  In January 2010, Kado complained of neck pain and stiffness, localized pain in the thoracic area, and lower back pain.  (Tr. 409.)  The following month, Kado reported severe cervical pain, as well as pain in her right shoulder, upper back, and neck.  (Tr. 406.)  In July 2010, Kado reported neck pain and stiffness, localized pain and tenderness in the thoracic area, and pain in the left flank and pelvic region.  (Tr. 403.)  Several months later, in November 2010,

8

Kado reported pain and stiffness in her neck and bilateral knees.  (Tr. 400.)  Examination revealed limited range of movement in Kado's lumbar spine, and positive straight leg raising bilaterally.  (*Id*.)  Dr. El-Gazzar noted an x-ray of Kado's thoraco lumbar spine "showed an evidence of scoliosis and mild degenerative changes."  (*Id*.)  He found Kado's pain was controlled with Soma, but added a prescription for Celerex.[3]  (*Id*.)

Kado continued to present to Dr. El-Gazzar throughout 2011 for treatment of her cervical, neck, and back pain.  (Tr.  385-399.)  In February 2011, Kado complained principally of severe lower back pain radiating to the back of her bilateral thighs and legs.  (Tr. 397.)  The pain was associated with numbness, tingling, burning, and weakness in her lower extremities, causing her to have difficulty standing and bending.  (*Id*.)  In May 2011, Kado reported that her scoliosis caused neck and back pain, was of moderate intensity, and had been progressively worsening.  (Tr. 393.)  She also complained of right shoulder pain.  (*Id*.)  On examination, Dr. El-Gazzar noted normal range of motion in Kado's neck, but decreased range of motion in her right shoulder.  (Tr. 394.)  He also observed normal gait, no limb or joint pain with range of motion, and 5/5 muscle strength in all major muscle groups with normal overall muscle tone. (*Id*.)  Dr. El-Gazzar assessed scoliosis and shoulder pain, and prescribed Vicodin.  (Tr. 394-395.)

In July 2011, Kado complained of chronic neck and back pain from scoliosis, noting particular discomfort in her cervical and lumbar spines.  (Tr. 390.)  Dr. El-Gazzar noted decreased range of motion in her neck and back, and diagnosed scoliosis and cervical disc

---

[3] Dr. El-Gazzar's treatment notes from 2010 variously diagnose Kado with the following conditions: cervical pain, cervical disc disease, upper back pain, chronic lower back pain, remote right clavicle fracture, flank pain, pelvic pain, scoliosis of the lumbar spine, and bilateral knee pain.  (Tr. 400-411.)

disorder.  (Tr. 391.)  Kado next presented to Dr. El-Gazzar in October 2011, after visiting the emergency room for left knee pain and swelling.  (Tr. 387, 543-544.)  On examination, Dr. El-Gazzar noted normal strength in Kado's upper and lower extremities, but limited range of motion, pain to palpation, and an abnormal gait.[4]  (Tr. 388.)  In December 2011, Kado reported worsening lower back pain.  (Tr. 385.)  Examination revealed pain with range of motion in Kado's back, but 5/5 muscle strength in all major muscle groups and normal overall muscle tone.  (Tr. 386.)

In January 2012, Kado presented to Dr. El-Gazzar with complaints of "pain all over with no specific localization."  (Tr. 382.)  She stated this generalized pain began two weeks prior without any apparent trigger.  (*Id.*)  Kado claimed the pain was "of almost unbearable intensity," and estimated it occurred several times daily.  (*Id.*)  On examination, Kado was anxious and appeared to be "moderately ill" and "in pain."  (Tr. 383.)  She had a normal gait, but exhibited pain with range of motion in her neck, back, and bilateral shoulders, hips, knees, and ankles.  (*Id.*)  Dr. El-Gazzar assessed generalized pain, scoliosis, cervical disc disorder, depression, chronic low back pain, and fibromyalgia.  (Tr. 383-384.)  He ordered lab work, referred Kado to a pain specialist and rheumatologist,[5] and prescribed Lexapro and Vicodin.  (Tr. 384.)  Kado returned to Dr. El-Gazzar in March 2012, complaining of localized pain in "the right collar bone and entire back, from the neck down."  (Tr. 380.)  Dr. El-Gazzar assessed generalized pain and

---

[4]  Kado returned to the emergency room in November 2011 for treatment of back pain.  (Tr. 545-546.)  She was diagnosed with a muscle spasm, and discharged home with prescriptions for Naproxen and Flexeril.  (*Id.*)

[5] The parties do not direct this Court's attention to any medical records indicating whether Kado followed through with these referrals or otherwise received treatment from either a pain management specialist or rheumatologist.

cervical disc disorder.  (Tr. 381.)

In June 2012, Kado presented to orthopedist Laurence Billfield, M.D., for evaluation status post right claviculectomy.  (Tr. 629-630.)  She complained of ongoing pain as well as numbness/tingling in her arm.  (Tr. 629.)  Dr. Billfield noted that Kado's "right clavicle wound was healing without any signs of infection or drainage," but "neurovascular status was abnormal and . . .she had a questionable Tinel's sign[6] at the wrist and at the elbow with complaint of numbness/tingling into her fingers."  (*Id*.)  Dr. Billfield recommended Kado "return in the future once she gets her neuro evaluation."  (*Id*.)

Kado returned to Dr. El-Gazzar in August 2012, with complaints of back pain.  (Tr. 378.)  Examination also revealed pain with range of motion in her right shoulder.  (Tr. 379.)  Dr. El-Gazzar diagnosed scoliosis, cervical disc disorder, and closed fracture of clavicle, noting that Kado was "scheduled for surgery at [Cleveland Clinic Foundation] in the next few weeks."  (*Id*.)  Kado next presented to Dr. El-Gazzar in October 2012, after seeking emergency treatment for chest pain.  (Tr. 376, 456-457.)  Dr. El-Gazzar noted tenderness over Kado's costochondral junctions and diagnosed Costochondritis.[7]  (Tr. 377.)

In October 2012, Kado presented to Dr. El-Gazzar with complaints of "worsening pain that is now shooting down left leg and butt."  (Tr. 373.)  She characterized the pain as sharp and stabbing, and of moderate intensity.  (*Id*.)  Examination revealed pain with range of motion in

---

[6]  A Tinel's sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  Dorland's Illustrated Medical Dictionary (30th ed.) at 1703.

[7] Costochondral junctions are the joints between the ribs and costal cartilage in the front of the rib cage.  Costochrondritis is an inflammation of the cartilage that connects a rib to the breastbone.

Kado's neck, and positive bilateral straight leg raise. (Tr. 374.) Dr. El-Gazzar also noted Kado

showed 4/5 strength in her bilateral quadriceps, iliopsoas and hip adductors, but 5/5 strength in

all other major muscle groups. (*Id*.) Finally, Dr. El-Gazzar noted muscle tenderness and

abnormal gait. (*Id*.)

**C.      State Agency Reports**

**1.      Mental Impairments**

Kado underwent a consultative examination with psychologist Richard N. Davis on June

25, 2009. (Tr. 345-351.) She reported that she had completed eight (8) to nine (9) years of

schooling and had been in learning disability classes. (Tr. 346.) Kado described herself as

"depressed, angry and anxious." (*Id*.) She reported frequent crying spells and occasional

anxiety attacks, explaining she becomes frustrated easily and "sometimes feels she is worthless

and that life is hopeless." (Tr. 347.) She claimed, however, that she had "never tried to kill

herself nor does she think about it." (Tr. 346.)

On examination, Dr. Davis found Kado spoke coherently, with no fragmentation of

thought or flight of ideas. (Tr. 347.) She maintained eye contact and was cooperative during the

examination. (*Id*.) Dr. Davis noted Kado knew the year, month, and day of the week, as well as

the President and the previous two Presidents. (Tr. 358.) She did not, however, know the

Governor of Ohio or the mayor of her city, and she was unable to do serial sevens. (*Id*.) Dr.

Davis found Kado was "limited in her abilities to think logically and use common sense and

judgment." (*Id*.)

In the summary section of his report, Dr. Davis found Kado (1) "present[s] with

limitations intellectually" and becomes frustrated easily; (2) is limited in her ability to relate

satisfactorily to others; and (3) is limited in her abilities to think logically and use common sense and judgment.  (Tr. 349.)  He diagnosed adjustment disorder with mixed disturbance of emotions/conduct, and borderline intellectual functioning; and assessed a GAF of 55.  (Tr. 350.)

 In terms of the four "work-related mental abilities," Dr. Davis found Kado was limited as follows:

> 1.   This claimant's mental ability to relate to others is within the moderate range. There is more than a slight limitation in this area but the individual is still able to have a couple people that she considers to be friends.  She seems to have problems with males in her life.  She did not indicate that she had problems with co-workers when she was employed.  She sees her mother frequently and gets along with her brothers when she sees them.
>
> 2.   The claimant's mental ability to understand, remember, and follow instructions is moderately impaired by her limitations intellectually.  She is functioning within the borderline range and has problems dealing effectively with life, finding it difficult.  She has 2 children and becomes easily frustrated with their behaviors.  It seems that she functions marginally in all aspects of her day-to-day living.
>
> 3.   The claimant's mental ability to maintain attention, concentration, persist at a task and to perform adequately is moderately limited.  She has some physical problems that additionally interfere with her being able to do a number of things and that additionally frustrates her.  She becomes frustrated fairly easily and says that she finds having to deal with life on a day-to-day basis difficult.
>
> 4.   The claimant's mental ability to withstand the stresses and pressures of her day-to-day activities is moderately impaired.  She gets along fairly satisfactorily for the most part but becomes easily frustrated and that leads to depression and anxiety.  She seems to be somewhat dependent upon males but then attracts those that are, for the most part, somewhat inadequate in their own respects and that only adds to her frustrations.

(Tr. 350-351.)

 In January 2013, state agency physician Vicki Warren, Ph.D., reviewed Kado's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 142-143.)  Dr. Warren

13

found Kado had (1) no restrictions in her activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence or pace; and (4) no repeated episodes of decompensation.  (Tr. 142.)  She concluded there was "no evidence of a severe psych [medically determinable impairment] imposing more than minimal work-related functional limitations."  (Tr. 143.)

State agency physician Mary K. Hill, Ph.D., reviewed Kado's records several months later, in March 2013, and reached the same conclusions.  (Tr. 156-157.)

### 2.      Physical Impairments

On January 12, 2013, state agency physician Diane Manos, M.D., reviewed Kado's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. [8] (Tr. 144-145.)  Dr. Manos determined Kado could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; and, sit for a total of about 6 hours in an 8 hour workday. (Tr. 144.)  She further opined Kado had unlimited push/pull capacity and no postural or manipulative limitations.  (Tr. 144-145.)  Dr. Manos did, however, conclude that Kado should avoid concentrated exposure to hazards (such as commercial driving, moving machinery, and unprotected heights) due to pain with cervical spine range of motion.  (Tr. 145.)

Subsequently, in April 2013, state agency physician Anne Prosperi, D.O., reviewed Kado's medical records and completed a physical RFC Assessment.  (Tr. 158-159.)  Dr. Prosperi reached the same conclusions as Dr. Manos regarding Kado's physical functional limitations.

---

[8] The parties do not direct this Court's attention to any treating or examining physician opinion regarding limitations resulting from Kado's physical impairments.

(*Id*.)

**D.     Hearing Testimony**

During the May 13, 2014 hearing, Kado testified to the following:

- She lives with her mother.  She (Kado) helps with the dishes and laundry, straightens up, and does some meal preparation.  She stopped driving three or four years ago because of her back and arm pain.  (Tr. 37-38.)

- She worked part-time as a cashier at a retail clothing store from October 2013 to one week before the hearing.   This position required her to lift five to ten pounds, and be on her feet "the whole time" she was working.  The longest she worked in one day was six hours.  She left this job because it was too difficult for her to sit and stand for such long periods.  (Tr. 39-42.)

- She also has previous employment experience babysitting and cleaning hotel rooms and residences.  In her cleaning positions, she was on her feet most of the workday.  She left her job at the hotel because it was "really hard" on her.  (Tr. 42-48.)

- The "biggest problem" that keeps her from working is her right arm pain and weakness.  She has particular difficulty lifting, pulling, and reaching with her right arm.  She cannot, for example, lift her right arm over her head without the help of her left arm.  It is painful for her to reach in front or to the side.  In addition, she experiences numbness and weakness in her right hand, causing her to drop things.  She cannot carry anything with her right arm, and can only lift "a couple of pounds" with her left arm.  (Tr. 50-55.)

- She experiences pain in her neck, radiating down her right arm to her lower back and right hip.  She described the pain as constant aching, stabbing, shooting, and burning.  (Tr. 55-56.)

- As a result of her pain, she has difficulty standing, walking, and sitting.  She estimated she can stand for 30 for 40 minutes before needing to sit down.  She would then need to sit for 15 to 20 minutes before she could resume standing.  Walking "is worse."  She can walk approximately half a block before having to sit down.  She can sit for 30 to 40 minutes before needing to get up.  There are days when she would need to lie down for awhile to relieve the pain.  (Tr. 58-60.)

- She has good days and bad days.  On a bad day, the pain is so bad she cannot leave her bedroom.  This occurs approximately four to five days week.  At one point she was prescribed Vicodin and Flexeril.  These medications, however,

15

did not alleviate her pain.  (Tr. 56-58.)

- She also experiences depression and anxiety.  She described her depression symptoms as follows: "What do I experience with the depression?  I'm just– I'm so negative about everything, I just cry, it's like I don't want to talk to nobody, I don't want to be around nobody, I just want to be in a room by myself."  (Tr. 62.)  There are days when she does not want to leave her room because of her depression.  (Tr. 62-63.)

- Because of her anxiety, she has difficulty going out in public.  She experiences panic attacks at least once a week.  When she has a panic attack, she feels hot and shaky, her heart races, and she experiences blurred vision.  Her panic attacks happen randomly.  In the past, she has had to remove herself from a situation for approximately 15 minutes due to a panic attack.  (Tr. 63-65.)

- She has difficulty sleeping, which affects her memory and concentration.  She does not believe she can concentrate long enough to watch a television show.  (Tr. 65-66.)

- She had been seeing a psychiatrist and taking medication for her depression until she lost her health insurance.  She recently got her insurance back, and was planning to resume her mental health treatment.  (Tr. 56-57.)

- She sees her mother, brother, cousins, uncle and aunt on a regular basis.  She has a boyfriend, whom she sees every day.  She does not belong to any clubs, organizations, or churches.  (Tr. 38-39.)

The VE testified Kado had past work as a cashier, retail sales attendant, cleaner/housekeeper, and childcare worker.  (Tr. 69-70.)  The ALJ then posed the following hypothetical question:

First off, I'd like you to consider a person with the same age, education, and past work as the claimant who's able to occasionally lift 20 pounds and frequently lift 10 pounds; is able to stand and walk six hours of an eight-hour workday; is able to sit for six hours of an eight-hour workday; would have unlimited push and pull other than shown for lift and/or carry; could never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to hazards and by that, I mean commercial driving, moving machinery, and unprotected heights.

(Tr. 70-71.)

The VE testified the hypothetical individual would be able to perform Kado's past work

16

as a sales attendant, cashier, and childcare worker.  (Tr. 71.)  She further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as fast food worker (light, SVP 2), reception clerk (sedentary, SVP 3), and packer (light, SVP 3).  (Tr. 72.)

The ALJ then asked a second hypothetical that was the same as the first but added the additional limitation that "this hypothetical individual can perform no overhead reaching with the right upper extremity and frequent handling and fingering with the right upper extremity." (Tr. 72-73.)  The VE testified this hypothetical individual would not be able to perform Kado's past work as a sales attendant, childcare worker, or cleaner, but could perform her past work as a cashier.  (Tr. 74.)  The VE also stated the hypothetical individual could perform the previously identified representative jobs of fast food worker, receptionist, and packer.  (Tr. 73-74.)

The ALJ then asked a third hypothetical that included the limitations in the first two, and added the following additional limitation:

> I'd like you to further assume that this hypothetical individual can perform what I call simple, repetitive tasks consistent of [sic] unskilled work with superficial interaction with others and by superficial I mean of a short duration for a specific purpose with no fast paced or high production quotas and with infrequent change where changes can be easily explained.

(Tr. 74-75.)  The VE testified this hypothetical individual could not perform any of Kado's past work and, further, could not perform the fast food worker or receptionist jobs.  (Tr. 75.)  The VE stated, however, the hypothetical individual could perform other representative jobs, such as inspection worker (light, unskilled, SVP 2) and bench assembler (light, unskilled, SVP 2).  (Tr. 75-76.)

The ALJ then asked the VE "to further assume that this hypothetical individual might be

off task approximately 20% of the time due to issues with either chronic pain and/or depression."
(Tr. 76.)  The VE testified there would not be any jobs for such a hypothetical individual.  (*Id*.)

Kado's attorney then asked the VE to assume several variations on the hypothetical
questions posed by the ALJ.  Counsel first asked the VE whether all employment would be
precluded if a person were to be absent two or more days per month.  (Tr. 77.)  The VE
responded that such a limitation would preclude all employment.  (*Id*.)  Counsel then asked the
VE to assume the hypothetical individual was limited to occasional reaching in all directions.
(Tr. 78-79.)  The VE testified such a limitation would preclude all of the previously identified
jobs.  (Tr. 79.)  Counsel then asked the VE to assume the individual was limited to occasional
handling, and to occasional fingering.  (*Id*.)  The VE responded that such limitations would also
preclude all of the previously identified jobs.  (*Id*.)

Finally, counsel asked the VE to assume the individual required "a sit/stand option such
that they would be permitted to sit up to 45 minutes at a time, stand up to 30 minutes at a time,
and between switching those positions, they may, you know, take five minutes or a couple of
minutes just to kind of stretch or walk away from their workstation briefly."  (Tr. 79.)  The VE
testified that, if the individual needed to physically leave his/her workstation every 45 minutes
for a period of two to five minutes, that would be "too much accommodation."  (Tr. 79-80.)  If,
however, the individual "were to just need to basically make a couple minute change where they
would remain at their workstation and on task but they'd have to stand up to stretch or likewise
sit down," such a limitation would not be work preclusive.  (Tr.  80.)  Rather, such a restriction
would limit the individual to sedentary work.  (*Id*.)

18

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful

19

activity, has a severe impairment that is expected to last for at least twelve months, and the

impairment, or combination of impairments, meets or medically equals a required listing under

20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of

age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the

claimant's impairment or combination of impairments does not prevent him from doing her past

relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his

past relevant work, if other work exists in the national economy that the claimant can perform,

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Kado was insured on her alleged disability onset date, October 1, 2008 and

remained insured through June 30, 2010, her DLI.  (Tr. 12.)  Therefore, in order to be entitled to

POD and DIB, Kado must establish a continuous twelve month period of disability commencing

between these dates.  Any discontinuity in the twelve month period precludes an entitlement to

benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d

191, 195 (6th Cir. 1967).

#### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

2.    The claimant has not engaged in substantial gainful activity since October 1, 2008, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 *et seq.*)

3.    The claimant has the following severe impairments: curvature of lumbar spine/scoliosis, cervical disc disease, fibromyalgia, status post right collarbone removal, affective disorders (mood disorder/bipolar disorder/depression/adjustment disorder), borderline intellectual functioning

20

and alcohol dependence (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR  404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk 6 hours of an 8-hour workday, is able to sit for six hours of an 8-hour workday, unlimited push and pull other than shown for lift and/or carry; avoid concentrated exposure to hazards such as commercial driving, moving machinery and unprotected heights; never climb ladders, ropes or scaffolds; no overhead reaching with the right upper extremity; frequent handling and fingering with the right upper extremity; can perform simple repetitive tasks commensurate with unskilled work; with superficial interaction with others meaning of a short duration and for a specific purpose; with no fast pace or high production quotas and with infrequent change where changes can easily be explained.

6.     The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on December [] 1981 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2008, through the date of this decision   (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-22.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d

22

at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White*, 572 F.3d at 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      First Assignment of Error: Concentration, Persistence, and Pace**

In her first assignment of error, Kado argues the RFC is not supported by substantial evidence because it fails to properly accommodate her limitations in maintaining concentration,

23

persistence and pace.  (Doc. No. 12 at 6-10.)  She maintains the ALJ recognized Kado's

limitations in this area when she gave significant weight to Dr. Davis' opinion that Kado's

"mental ability to maintain attention, concentration, persist at a task and to perform adequately is

moderately limited."  (Tr. 350-351.)  Kado claims, however, the ALJ failed to include adequate

limitations in the RFC on this issue and, further, "failed to explain why Ms. Kado's limitations in

concentration, persistence, and pace were not accommodated for within the identified residual

functional capacity."  (Doc. No. 12 at 9.)  Kado further asserts the ALJ "substituted her own

medical judgment without any basis in the medical evidence."  (*Id*.)

The Commissioner argues the ALJ's determination was reasonable and within the "zone

of choice" afforded by the medical evidence of record.  (Doc. No. 13 at 6.)  Moreover, the

Commissioner asserts the RFC did, in fact, "capture the limitations suggested by Dr. Davis'

report" because it included both concentration, speed, and pace restrictions.  (*Id*.)

The RFC determination sets out an individual's work-related abilities despite his or her

limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An

ALJ "will not give any special significance to the source of an opinion on issues reserved to the

Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and

must consider all of a claimant's medically determinable impairments, both individually and in

combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence

upon which he is relying, and he may not ignore evidence that does not support his decision,

especially when that evidence, if accepted, would change his analysis." *Fleischer,* 774

F.Supp.2d at 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140,

148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he

'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...]

contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7,

1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical

source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the

adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to

determine, however, it is well established that the claimant bears the burden of establishing the

impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th

Cir. 1999).

      Here, the ALJ determined at step two that Kado suffered from the severe mental

impairments of  "affective disorders (mood disorder/bipolar disorder/ depression/ adjustment

disorder)," borderline intellectual functioning, and alcohol dependence.  (Tr. 15.)   The ALJ then

determined, at step three, that Kado's mental impairments did not meet or medically equal the

criteria of Listing 12.04.  Of particular note, the ALJ concluded that, with regard to

concentration, persistence or pace, Kado had moderate difficulties, explaining that "[a]lthough

the claimant is sensitive to stress, the ability to concentrate during the hearing and consultative

examinations, her ability to respond appropriately to questions, watch her children, watch

television and work on a part-time basis indicates that difficulties in this area are neither marked

nor extreme."  (Tr. 16-17.)

      At step four, the ALJ considered Kado's school records and recounted the medical

evidence regarding Kado's mental impairments.  (Tr. 19-20.)   The ALJ then considered the

opinion evidence, concluding as follows:

> As for the opinion evidence, the undersigned notes that the record does not
> contain a treating source opinion.  The undersigned accords significant weight to
> Mr. Davis' opinion that the claimant experiences an adjustment disorder and
> borderline intellectual functioning resulting in a moderate level of symptoms
> (exh. 1F p. 7).  Mr. Davis' opinion is consistent with his evaluation of the
> claimant noting that she is able to get along with others, she is able to provide a
> detailed history and respond to questions, she is able to care for her children, and
> has some difficulty responding to stress in an appropriate manner (exh. 1F pp. 7-
> 8).

> In extending maximum credibility to the claimant's allegations regarding her
> mental impairments, and taking into consideration the findings of Mr. Davis, the
> undersigned accords little weight to the State agency consultative psychologists'
> opinions at Exhibits 7F and 8F which find the claimant's mental impairments are
> not severe.[9]

(Tr. 20.)  The ALJ then formulated the RFC, which limited Kado (in relevant part) to "simple

repetitive tasks commensurate with unskilled work; with superficial interaction with others

meaning of a short duration and for a specific purpose; with no fast pace or high production

quotas and with infrequent change where changes can easily be explained."  (Tr. 17.)

In support of her argument that the RFC fails to adequately account for her moderate

limitations in concentration, persistence, or pace, Kado relies principally on *Ealy v. Comm'r of

Soc. Sec.*, 594 F.3d 504 (2010).  In *Ealy*, the state agency physician opined Ealy had moderate

limitations in concentration, persistence or pace, and specifically concluded that Ealy "retained

the mental ability to: . . . sustain attention to complete simple repetitive tasks for two-hour

segments over an eight hour day where speed was not critical."  *Id.* at 515-516.  The ALJ relied

---

[9] This appears to be a reference to the opinions of state agency physicians Drs. Warren
and Hill, which are found at Exhibits 4A and 7A, respectively.  (Tr. 137-148, 151-162.)

on this opinion but, in the hypothetical to the VE, the ALJ simply limited Ealy to "simple, repetitive tasks and instructions in non-public work settings." *Id*. at 510.  The Sixth Circuit determined the ALJ's hypothetical question was inadequate to convey Ealy's limitations because it omitted the speed and pace based restrictions set forth in the state agency physician's opinion. *Id*. at 516.  Thus, reversal and remand was necessary because "the ALJ relied upon [the state agency physician's] assessment, yet the ALJ did not fairly reflect that assessment in the hypothetical because the [ALJ] failed to conclude Ealy's time and speed restrictions." *Id*. at 517.

The Court finds *Ealy* to be distinguishable.  Here, both the ALJ's hypothetical question to the VE and the RFC limited Kado not only to "simple, repetitive tasks commensurate with unskilled work," but also to work "with superficial interaction with others meaning of a short duration and for a specific purpose; with no fast pace or high production quotas and with infrequent change where changes can easily be explained."  (Tr. 17, 74-75.)  Thus, unlike *Ealy*, both the hypothetical and the RFC in the instant case contain concentration, speed, and pace based restrictions.  Kado fails to explain how these restrictions, taken as a whole, fail to adequately account for her moderate limitations in concentration, persistence, and pace, nor does she identify any additional restrictions that she feels should have been included in the RFC. Thus, *Ealy* (as well as the other district court cases cited by Kado) are distinguishable from the instant case.  *See Foreman v. Colvin*, 2013 WL 3200615 at * 13 (N.D. Ohio June 24, 2013) (White, M.J.) (finding *Ealy* distinguishable because the hypothetical included a pace-based restriction in addition to a limitation to simple, routine tasks);  *Kline v. Astrue*, 2013 WL 1947164 at * 5, fn. 1 (N.D. Ohio April 17, 2013) (White, M.J.) (noting that "[t]he VE's testimony

27

was based on a hypothetical with a pace restriction, making the case at bar distinguishable from *Ealy*" ).

Even aside from this distinguishing feature, it bears noting the Sixth Circuit has declined to find that *Ealy* established a *per se* rule concerning the level of functional limitations that must be ascribed where a claimant is determined to have moderate limitations in his or her ability to maintain "concentration, persistence, or pace."  *See Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 635 (6th Cir. Jan. 12, 2016) ("Case law in this Circuit does not support a rule that a hypothetical providing for simple, unskilled work is *per se* insufficient to convey moderate limitations in concentration, persistence, and pace.").  *See also, e.g.., Jackson v. Comm'r of Soc. Sec.*, 2011 WL 4943966 (N.D. Ohio Oct.18, 2011) (Boyko, J.); *accord Wheeler v. Colvin*, 2016 WL 1599961 at * 12 (N.D. Ohio April 21, 2016) (Vecchiarelli, M.J.); *Kline v. Astrue*, 2013 WL 1947164 at *5 (N.D. Ohio Apr. 17, 2013) (White, M.J.), report and recommendation adopted *sub nom.*, *Kline v. Colvin*,  2013 WL 1946201 (N.D. Ohio May 9, 2013); *Todd v. Astrue*, 2012 WL 2576435 (N.D. Ohio May 15, 2012) report and recommendation adopted, 2012 WL 2576282 (N.D. Ohio July 3, 2012); *Clayton v. Astrue*, 2013 WL 427407 (S.D. Ohio Feb.1, 2013); *Horsely v. Astrue*, 2013 WL 55637 (S.D. Ohio Jan.3, 2013).  Indeed, as one court within this district has explained,  *Ealy* "does not require further limitations in addition to limiting a claimant to 'simple, repetitive tasks' for every individual found to have moderate difficulties in concentration, persistence, or pace."  *Jackson*, 2011 WL 4943966, at *4.  Rather, "*Ealy* stands for a limited, fact-based[ ] ruling in which the claimant's particular moderate limitations required additional speed- and pace-based restrictions."  *Id*. at 4.

Unlike the state agency physician in *Ealy*, consultative examiner Dr. Davis did not

place any concrete functional limitations on Kado's abilities to maintain attention, concentration or pace when performing simple, repetitive tasks.  Rather, Dr. Davis simply opined (and the ALJ agreed) that Kado's "mental ability to maintain attention, concentrate, persist at a task, and to perform adequately is moderately limited."  (Tr.  20, 350.)  Kado has not cited to any evidence in the record that provides for specific, concrete limitations on her ability to maintain concentration, persistence or pace while doing simple, unskilled work.  Nor, as noted above, has she articulated any additional concentration, persistence, or pace-related limitations that she believes should have been included in the RFC.

Accordingly, and for all the reasons set forth above, Kado's first assignment of error is without merit.

**B.       Second Assignment of Error: Evaluation of Kado's Pain**

In her second assignment of error, Kado argues "the ALJ completely neglected to analyze [her] complaints of pain, and determine the extent of their validity."  (Doc. No. 11 at 10.)  Kado asserts this omission is particularly troubling in light of the fact that she suffers from fibromyalgia, which is "often based solely on subjective complaints of symptoms because the disability is not the condition itself but the associated symptoms."  (*Id*. at 11.)  She further claims the ALJ failed to fully evaluate Kado's fibromyalgia consistent with Social Security Ruling ("SSR") 12-2p, after determining at step three that it did not meet a listing.  (*Id*. at 13-14.)  Rather, Kado maintains the ALJ improperly adopted the opinions of the non-examining state agency physicians and failed to conduct "a thorough evaluation of the pain, including a longitudinal evaluation of the record."  (*Id*. at 14.)

The Commissioner asserts, and this Court believes does so correctly, that the ALJ

29

properly evaluated Kado's pain.  She notes the ALJ indicated that "Kado's actions regarding medication and treatment did not support her allegations of limitations beyond those the ALJ found."  (Doc. No. 13 at 8.)  In particular, the Commissioner emphasizes the ALJ's finding that Kado was found to be frequently in non-compliance with her prescribed medications and rebuffed efforts by treatment providers to help her obtain medical insurance.  (*Id.*)  In sum, the Commissioner argues the ALJ "reasonably discounted Kado's credibility and, with it, her complaints of pain."  (*Id.*)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96–7p, 1996 WL 374186 (July 2, 1996).  Essentially, the same test applies where the alleged symptom is pain,[10] as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See*

---

[10] In the context of evaluating a claimant's subjective complaints of pain, this test is often referred to as the "*Duncan* test."

also *Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

 If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").  To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996).  Beyond medical evidence, there are seven factors that the ALJ should consider.[11]  The ALJ need not analyze all seven factors, but should show that he

---

[11] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's

31

considered the relevant evidence.  *See Cross*, 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis.2005).

Here, the ALJ found, at step two, that Kado suffered from the severe physical impairments of curvature of the lumbar spine/scoliosis, cervical disc disease, fibromyalgia, and status post right collarbone removal.  (Tr. 15.)  At this step, the ALJ specifically found that Kado's diagnosis of fibromyalgia satisfied the second prong of the criteria set forth in SSR 12-2p, in light of Kado's "medically documented and repeated manifestations of numerous symptoms, signs, and/or co-occurring conditions."  (Tr. 15-16.)

At step three, the ALJ determined Kado's curvature of the spine and cervical degenerative disc disease did not meet the criteria of Listing 1.04.  (Tr. 16.)  With respect to Kado's fibromyalgia, the ALJ concluded that "[w]hile Social Security Ruling 12-2p addresses the method for evaluating fibromyalgia, the undersigned notes that no listing of impairment directly pertains to fibromyalgia."  (*Id.*)  Thus, the ALJ found that "the severity of the claimant's fibromyalgia fails to meet any listing of impairment because no such listing exists."  (*Id.*)

The ALJ then discussed the medical evidence regarding Kado's physical impairments.  (Tr. 19.)  In particular, the ALJ noted treatment records from Dr. Seitz, Dr. El-Gazzar, and Dr. Billfield, which indicated pain, limited range of motion and tenderness but also documented "surprisingly good" shoulder mobility, normal sensation and reflexes, normal strength, normal gait, and normal muscle tone.  (*Id.*)  Moreover, the ALJ noted several treatment records

---

functional limitations and restrictions due to pain or other symptoms.  SSR 96–7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

indicating Kado was responding well to pain medication and/or physical therapy.  (*Id.*) As part of this discussion, the ALJ expressly acknowledged that Dr. El-Gazzar's treatment notes "demonstrate that the claimant has a history of fibromyalgia."  (*Id.*)

The ALJ next evaluated the opinion evidence, according "significant weight" to the state agency medical consultant opinions indicating Kado is capable of a reduced range of light work.  In this regard, the ALJ concluded that:

> The opinions are wholly consistent with treatment notes demonstrating the claimant has some limitation in range of motion in her right upper extremity, and consistent complaints of back and arm pain, however, she has not needed to follow a prescribed course of treatment.  As noted by Dr. Seitz, the claimant's perception of her functioning is much different than her actual capabilities.

(Tr. 21.)

The ALJ then formulated the RFC, expressly noting that she had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7 p."  (Tr. 18.)  In relevant part, the RFC limited Kado to light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b), with the exception that she is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand and walk 6 hours of an 8-hour workday; sit for six hours of an 8-hour workday; and engage in unlimited push and pull other than shown for lift and/or carry. (Tr. 17.)  In addition, the RFC limited Kado to avoiding concentrated exposure to hazards such as commercial driving, moving machinery and unprotected heights; never climbing ladders, ropes or scaffolds; no overhead reaching with the right upper extremity; and frequent handling and fingering with the right upper extremity.  (*Id.*)

33

The ALJ summarized her conclusions as follows:

> In sum, the above residual functional capacity assessment is supported by the medical evidence of record.  In making this finding, the undersigned has extended maximum credibility to the claimant's assertions that her impairments extend back to October 1, 2008, in light of the minimal evidence of record between 2008 and 2010.  The undersigned has taken into consideration the claimant's non-compliance with medications and alcohol use (see, e.g., exh. 7F p. 5.)  The undersigned has also taken into consideration the claimant's assertion that she lacks the financial resources to obtain treatment and medication, but notes that MetroHealth attempted to assist her become rated and the claimant did not follow-up.  Accordingly, the undersigned finds that the claimant is able to sustain basic work activities on a regular and continuing basis at a reduced range of light exertional functioning.

(Tr. 21.)

Kado asserts "the ALJ's failure to analyze [her] complaints under the *Duncan* test substantially prejudiced [her] claim and does not allow a subsequent reviewer to fully understand how the ALJ formulated the [RFC]."  (Doc. No. 12 at 13.)  It is not clear whether Kado believes the ALJ erred by not explicitly following the *Duncan* framework, or whether she challenges the findings by the ALJ under a *Duncan* analysis.  In any event, the Court finds Kado's argument to be without merit.

First, to the extent Kado alleges the ALJ erred because she failed to explicitly analyze her pain complaints under *Duncan*, the Court rejects this argument.  The ALJ specifically noted in the decision that she had evaluated Kado's symptoms under the requirements of 20 CFR §§ 404.1529 and 416.929 and SSR 96-7.  (Tr. 18.)  The Sixth Circuit has held that "an ALJ who follows the requirements of 20 CFR § 404.1529 does not commit error by failing to explicitly follow *Duncan*."  *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 835 (6th Cir. 2005).  *See also Baranich v. Barnhart*, 128 Fed. Appx. 481, 483 (6th Cir. 2005).  Thus, this argument is without merit.

34

To the extent Kado challenges the ALJ's analysis of her pain complaints under *Duncan* and 20 CFR § 404.1529, the Court rejects this argument as well.  Here, the ALJ recognized that Kado's medically determinable impairments could reasonably be expected to cause the alleged symptoms, thus satisfying the first step in the two-step process set forth in *Duncan*, 20 CFR § 404.1529 and SSR 96-7p.  (Tr. 18.)  The ALJ determined, however, that Kado's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely credible."  (*Id*.)  Reading the decision as a whole, the Court finds that the ALJ considered the entire record and articulated sufficiently specific reasons for this credibility determination.

First, contrary to Kado's argument on appeal, the ALJ did not "completely neglect" Kado's pain complaints nor did she fail to conduct a longitudinal evaluation of the record.  (Doc. No. 12.)  Rather, a review of the decision makes clear that the ALJ fully considered Kado's own statements regarding the nature and severity of her pain, as well as the medical evidence regarding her physical impairments.  (Tr. 19, 21.)  Specifically, the ALJ acknowledged Kado's testimony that she (1) stopped working because "it was hard to do and she was frequently absent from work;" (2) drops items with her left arm and experiences shooting pain when she lifts items such as a gallon of milk; (3) is limited to standing and sitting in thirty minute intervals; and (4) would be frequently absent from work and off task more than 20% of the work day due to her physical and mental impairments.  (Tr. 18.)  The ALJ also thoroughly discussed the medical evidence.  (Tr. 19.)  In particular, the ALJ recognized Kado had undergone a right total claviculectomy in February 2009 and had a history of fibromyalgia.  (*Id*.)  The ALJ then expressly discussed treatment records indicating Kado often suffered from limited range of motion, tenderness, pain, and numbness.  (Tr. 19.)  The ALJ also noted several positive objective

35

and clinical signs, including an x-ray demonstrating scoliosis and mild degenerative changes, a positive straight leg raising test, and a "questionable" Tinel's sign at the wrist and elbow.  (*Id*.)

The ALJ, however, concluded Kado's allegations of disabling pain were not fully credible for several reasons.  The ALJ noted several treatment records indicating Kado was responding well to pain medication and physical therapy.  (Tr. 19.)  Moreover, in according "significant weight" to the state agency physician opinions that Kado was capable of a reduced range of light work, the ALJ observed that Kado "has not needed to follow a prescribed course of treatment" and her "perception of her functioning is much different than her actual capabilities."  (Tr. 21.)  Indeed, earlier in the decision, the ALJ found Kado had a "high degree of independence . . . and sustainability of activities," noting she was able to perform household chores, self-care and drive.  (Tr. 16.)  Lastly, the ALJ remarked that she had taken into consideration Kado's non-compliance with medications.  (Tr. 21.)  In this regard, the ALJ recognized Kado's assertion that she lacked the financial resources to obtain treatment and medication, but noted that "MetroHealth attempted to assist her to become rated and the claimant did not follow-up."  (*Id*.)  Significantly, Kado does not argue that any of these reasons are not supported by substantial evidence in the record.

While the decision admittedly could have contained a more specific credibility analysis, given the high deference owed to an ALJ's credibility findings and the ALJ's discussion of the record, the Court finds the ALJ's credibility analysis is supported by substantial evidence. Further, to the extent Kado contends the ALJ failed to assess her credibility in light of the relevant factors, this argument is not well taken as the ALJ did discuss several of the factors set forth in SSR 96-7p, including Kado's daily activities; the location and intensity of her

36

symptoms; the effectiveness of medication taken to alleviate her symptoms and other treatment Kado received (such as physical therapy) to relieve symptoms; and other factors such as her non-compliance with treatment.

Kado nevertheless insists the ALJ's analysis of her pain was flawed because the ALJ failed to properly analyze her fibromyalgia.  Kado notes that "fibromyalgia patients present no objectively alarming signs" and are "often based solely on subjective complaints of symptoms." (Doc. No. 11 at 11.)  She maintains the ALJ's failure to fully evaluate her fibromyalgia consistent with SSR 12-2p at step four of the sequential evaluation process constitutes reversible error.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244, n.3 (6th Cir. 2007) (quoting Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed. 2005)).  *See also* SSR 12–2p, 2012 WL 3104869 at *2 (describing fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months.").  CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity."  *Preston v. Sec'y of Health & Human Servs*., 854 F.2d 815, 820 (6th Cir. 1988*).* Moreover, "physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion."  *Preston*, 854 F.2d at 818.  *See also Rogers*, 486 F.3d at 244.  However, the mere diagnosis of the condition "does not automatically entitle [a claimant] to disability benefits....

Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not and the question is whether claimant is one of the minority." *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx 801, 806 (6th Cir. 2008).

In July 2012, the SSA released SSR 12-2p, which "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how we evaluate fibromyalgia in disability claims ...." SSR 12-2p, 2012 WL 3104869, at *1 (July 25, 2012). To that end, SSR 12-2p describes criteria for establishing that a person has a medically determinable impairment of fibromyalgia, the sources of evidence the ALJ may look to, and how a claimant's subjective assertions of pain and functional limitations are evaluated. *Id. See also Luukkonen v. Comm'r of Soc. Sec.*, 2016 WL 3426370 at * 4 (6th Cir. June 22, 2016). The Ruling emphasizes that fibromyalgia should be analyzed under the traditional five-step evaluation process used for analyzing other disability claims. *See* SSR 12-2p at *5–6. Importantly, SSR 12-2p "is merely a binding interpretation of that which was already lawfully in effect." *Luukkonen*, 2016 WL 3426370 at * 4. "In other words, SSR 12-2p merely provides guidance on how to apply pre-existing rules when faced with a claimant asserting disability based on fibromyalgia." *Id.*

The Court finds the ALJ did not improperly evaluate Kado's fibromyalgia under SSR 12-2p. As Kado acknowledges, the ALJ recognized Kado's fibromyalgia as a severe impairment at step two, and went on to find at step three that "the severity of the claimant's fibromyalgia fails to meet any listing of impairment because no such listing exists." (Tr. 15-16.) The ALJ then expressly recognized Kado's history of fibromyalgia at step four, and discussed treatment records documenting Kado's complaints of pain and stiffness in her upper extremities, back pain,

38

positive straight leg raising, and limited range of motion in her lumbar spine.  (Tr. 19.)  Kado does not meaningfully explain how this analysis is insufficient under SSR 12-2p.  Upon review, the Court finds the ALJ properly analyzed Kado's fibromyalgia under the five step sequential evaluation process, as required under SSR 12-2p and Sixth Circuit precedent.  *See Luukkonen*, 2016 WL 3426370 at * 4.

The Court further finds the ALJ did not improperly evaluate Kado's credibility with respect to her fibromyalgia symptoms.  The ALJ articulated several reasons for discounting the credibility of Kado's pain complaints, including (1) Kado's "high degree of independence . . . and sustainability of activities," (2) her non-compliance with medications and treatment; and (3) treatment records indicating Kado was responding well to pain medication and physical therapy.  (Tr.  16, 19, 21.)  Kado has not directed this Court's attention to any authority indicating it was improper for the ALJ to rely on these reasons in assessing the credibility of Kado's complaints of pain associated with her fibromyalgia.  Moreover, Kado has not challenged these reasons as being unsupported by substantial evidence.[12]

Finally, in her Reply Brief, Kado argues, *for the first time*, that "while specifically

---

[12] While Kado correctly notes that fibromyalgia patients present "no objectively alarming signs," she does not clearly argue that the ALJ in the instant case improperly based her credibility determination on the lack of objective medical evidence and/or the fact that Kado's treatment records sometimes contained "normal" physical examination findings. A review of the decision indicates the ALJ recounted the medical evidence regarding Kado's severe physical impairments, including both "normal" and "abnormal" physical examination findings.  While the ALJ notes several normal physical examination findings, however, her credibility determination is based principally on Kado's non-compliance with medications and treatment.  Again, as noted above, Kado does not argue that the ALJ's conclusions regarding her non-compliance are not supported by substantial evidence.

indicating she did not 'meet' a listing because no listing exists to evaluate fibromyalgia, notable

[sic] absent from the ALJ's terse evaluation of the fibromyalgia is any consideration of the

concept of 'equivalence' to a listing.  Yet, according to the regulations, this is exactly the type of

case that requires an evaluation of the concept of 'equaling' a listing." (Doc. No. 14 at 3.)  Kado

then argues, summarily, that remand is required because "if properly considered, she could

'equal' the listings."[13]  (*Id.*)

    The Court will not address arguments raised for the first time in a Reply Brief.  As

another court within this District has explained:

> It is well-established that a party should not raise new arguments in a reply
> brief. *Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 553 (6th Cir. 2008).  A reply
> brief provides a plaintiff the opportunity to respond to arguments raised for the
> first time in the defendant's brief.  But, the plaintiff cannot wait until its reply
> brief to assert new arguments because such a practice would effectively deprive
> the defendant of the opportunity to expose weaknesses in the plaintiff's
> arguments. *Id*.  "These waiver and forfeiture rules ensure fair and evenhanded
> litigation by requiring parties to disclose legal theories early enough in the case
> to give an opposing party time not only to respond but also to develop an
> adequate factual record supporting their side of the dispute." *Winnett v.
> Caterpillar,* Inc., 553 F.3d 1000, 1007 (6th Cir. 2009).  District courts in this
> circuit have applied this doctrine in Social Security cases. *E.g. Caley v. Astrue,*
> No. 5:11–CV–1146, 2012 WL 1970250, at *15, n. 11 (N.D. Ohio June 1, 2012)
> (Vecchiarelli, J.); *Hamilton v. Comm'r of Soc. Sec.*, No. 1:09–CV–260, 2010
> WL 1032646, at *6 (N.D. Ohio Mar.17, 2010) (White, J.); *Johnson v. Comm'r
> of Soc. Sec.*, No. 1:09–CV–967, 2011 WL 4954049, at *11 (W.D. Mich.
> Sept.22, 2011).

*Bender v. Comm'r of Soc. Sec.*, 2012 WL 3913094 at * 8 (N.D. Ohio Aug.17, 2012).  *See also*

*Daniels v. Colvin*, 2015 WL 4394412 at * 18 (N.D. Ohio July 16, 2015).  Because Kado failed to

challenge the ALJ's decision on this basis in her Brief on the Merits, the Court deems this

───────────────

[13] Kado does not identify which Listing she believes she could "equal," nor does she
explain how any of the medical evidence of record might demonstrate "equivalence" to a
Listing.

40

argument waived and will not address it herein.

Accordingly, and for the reasons set forth above, the Court finds the ALJ did not improperly evaluate Kado's pain.[14]  While Kado argues the ALJ failed to properly credit evidence regarding her complaints of pain, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  The ALJ provided sufficient reasons for his credibility determination supported by reference to specific evidence in the record.  Kado's second assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

    *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: September 7, 2016

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

[14] To the extent Kado is arguing the RFC is not supported by substantial evidence, this argument is rejected as well.  As set forth above, the ALJ fully considered Kado's physical impairments (including her fibromyalgia) at step four.  Kado has not identified any specific additional physical functional limitations that she believes should have been included in the RFC.  Nor has she directed this Court's attention to any physician opinion identifying physical functional limitations greater than that set forth in the RFC.