# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **MELISSA L. KADO,** | ) | **CASE NO. 1:15-cv-02044-DAP** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE DAN AARON POLSTER** |
| | ) | |
| **vs.** | ) | <u>**MEMORANDUM OF OPINION**</u> |
| | ) | <u>**AND ORDER**</u> |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

Plaintiff, Melissa Kado ("Kado"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 et seq. ("the Act"). The Court referred the case to Magistrate Judge Jonathan D. Greenberg for preparation of a Report and Recommendation ("R&R") pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b). After reviewing the record, Magistrate Judge Greenberg recommends that the Commissioner's decision be affirmed. R&R, Doc #: 15. However, Kado objects to the R&R on

two grounds. Objs., Doc #: 17.

The Court has reviewed the record, the briefings, the R&R, and Kado's objections. For the reasons set forth herein, the Court declines to adopt in part the R&R insofar as it affirms the Administrative Law Judge's ("ALJ") assessment of whether Kado's impairments meet or equal a listing at Step Three. The Court adopts in part the R&R insofar as it affirms the ALJ's assessment of Kado's residual functional capacity. Thus, the Court vacates and remands the decision of the ALJ to the Social Security Administration ("SSA") for further proceedings consistent with this opinion.

## I.      Case  History

Kado filed applications for POD, DIB, and SSI in October 2012. Application for SSI 1, Tr. 214, Doc #: 11; Application for DIB 1, Tr. 220. Kado alleges disability beginning on October 1, 2008. *Id.* at 1, Tr. 214. Kado filed for disability due to clavical removal, screws and plates in neck, bipolar disorder, fibromyalgia, and depression. Disability Determination Explanation 1, Tr. 125. Her claim was denied initially on January 23, 2013. *Id.* at 11, Tr. 135. Her claim was denied again on April 1, 2013, upon reconsideration. Disability Determination Explanation 11, Tr. 161. Kado then requested a hearing before an ALJ. Request for Hearing 1, Tr. 208.

On May 13, 2014, the ALJ held a hearing, during which Kado, represented by counsel, and an impartial vocational expert testified. Transcript of Oral Hearing 10, 41, Tr. 37, 68. During the hearing, Kado testified to the following:

- She lives with her mother and helps around the house. Transcript of Oral Hearing 10–11, Tr. 37–38. She does not drive because of her back and arm pain. *Id.* at 11, Tr. 38.

-2-

- She sees her family and boyfriend on a regular basis, but she does not belong to any community clubs or organizations. *Id.* at 11-12, Tr. 38–39.

- She worked part-time as a cashier at a retail clothing store and occasionally performed sales attendant tasks, such as lifting boxes, from October 2013 to one week before the hearing. *Id.* at 12–15, Tr. 39–42. She left this job because it was too difficult for her to sit and stand for long periods. *Id.* at 14, Tr. 41. She was also a babysitter and cleaned hotel rooms and residences. *Id.* at 15–21, Tr. 42–48. She stopped doing such work because it was hard on her. *Id.*

- She described feeling pain on a daily basis, especially in her right arm, which, according to her, was the single biggest problem keeping her from work on a full-time basis. *Id.* at 23, 29–34, Tr. 50, 56–61.

- She also testified about her depression and other symptoms, stating that she had crying spells and would sometimes not leave her bedroom three or four days per week. *Id.* at 35–39, Tr. 62–66.

After Kado testified, the vocational expert testified. Transcript of Oral Hearing

41, Tr. 68. The ALJ posed the following hypothetical question to the vocational expert:

> First off, I'd like you to consider a person with the same age, education, and past work as the claimant who's able to occasionally lift 20 pounds and frequently lift 10 pounds; is able to stand and walk six hours of an eight-hour workday; is able to sit for six hours of an eight-hour workday; would have unlimited push and pull other than shown for lift and/or carry; could never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to hazards and by that, I mean commercial driving, moving machinery, and unprotected heights.

*Id.* at 43–44, Tr. 70–71. The vocational expert testified that such a person could perform Kado's

past work. *Id.* at 44, Tr. 71.

The ALJ then asked a second hypothetical that was the same as the first but added the

additional limitation that "this hypothetical individual can perform no overhead reaching with the

right upper extremity and frequent handling and fingering with the right upper extremity." *Id.* at

45–46, Tr. 72–73. The vocational expert testified that such an individual would not be able to perform Kado's past work as a sales attendant, childcare worker, or cleaner, but could perform her past work as a cashier. *Id.* at 47, Tr. 74.

The ALJ then asked a third hypothetical that included the limitations in the first two hypotheticals, and added the following additional limitation:

> I'd like you to further assume that this hypothetical individual can perform what I call simple, repetitive tasks consistent of [sic] unskilled work with superficial interaction with others and by superficial I mean of a short duration for a specific purpose with no fast paced or high production quotas and with infrequent change where changes can be easily explained.

*Id.* at 47–48, Tr. 74–75. The vocational expert testified that such an individual could not perform any of Kado's past work. *Id.* at 48, Tr. 75. The expert went on to explain that such an individual could perform other representative jobs, such as inspection worker and bench assembler. *Id.* at 48–49, Tr. 75–76.

The ALJ subsequently determined in a decision dated July 2, 2014, that Kado was not disabled and denied her all benefits. Decision 12, Tr. 23. In reaching her decision, the ALJ found that Kado suffered from the severe impairments of curvature of the lumbar spine/scoliosis, cervical disc disease, fibromyalgia, status post right collarbone removal, affective disorders, borderline intellectual functioning, and alcohol dependence. *Id.* at 4, Tr.15. The ALJ then assigned the following residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk 6 hours of an 8-hour workday, is able to sit for six hours of an 8-hour workday, unlimited

> push and pull other than shown for lift and/or carry; avoid concentrated exposure to hazards such as commercial driving, moving machinery and unprotected heights; never climb ladders, ropes or scaffolds; no overhead reaching with the right upper extremity; frequent handling and fingering with the right upper extremity; can perform simple repetitive tasks commensurate with unskilled work; with superficial interaction with others meaning of a short duration and for a specific purpose; with no fast pace or high production quotas and with infrequent change where changes can easily be explained.

*Id.* at 6, Tr. 17.

Based on the above residual functional capacity, the ALJ determined that Kado could not perform any of her past relevant work, but could engage in other competitive employment. *Id.* at 10–11, Tr. 21–22. Thus the ALJ determined that Kado was not disabled. *Id.* at 12, Tr. 23.

The ALJ's decision became final on August 13, 2015, when the Appeals Council declined further review. Notice of Appeals Council Action 1–3, Tr. 4–6. Kado filed her complaint, Doc #: 1, on October 2, 2015, to challenge the Commissioner's final decision.

## II.    Standard of Review

In reviewing a denial of Social Security benefits, the Court's review "is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied." *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). On judicial review, it is not necessary that the Court agree with the ALJ's finding. *Id.* (citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999)).

-5-

Rather, the ALJ's finding must only be substantially supported by the record. *Id.* "Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478

F.3d 742, 746 (6th Cir. 2006).

When a case is referred to a magistrate judge, under the relevant statute, a plaintiff is

entitled to object to the R&R within fourteen days after being served with a copy. 28 U.S.C.

§ 636(b)(1). Generally, the failure to timely file written objections to a magistrate judge's R&R

constitutes a waiver of the right to obtain a de novo review of the R&R in the district court and

also results in a waiver of the right to appeal. *See United States v. Droganes*, 728 F.3d 580, 586

(6th Cir. 2013); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). When objections

are filed, the district court must make a "de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made." 28 U.S.C.

§ 636(b)(1)(C).

III.    **Facts and Evidence**

The Court has reviewed the record, including medical records, opinions, and testimony. A

non-exhaustive summary of the facts and evidence is set forth below.

A.      **Physical Impairments**

The record reveals the following facts in relation to Kado's physical impairments:

- Kado has had a long-standing history of problems with her right clavicle, and she has had numerous surgical procedures dating back to 2002. Office Treatment Records (OTR) dated 12/16/2008 to 11/25/2009 2, Tr. 612.

- In December 2008, she was referred to orthopaedist William Seitz, Jr.,

M.D., for a consultation regarding ongoing severe pain involving her right shoulder. *Id.*

• Kado underwent surgery for a total claviculectomy revision on February 11, 2009. *Id.* at 3, Tr. 613. Kado had a successful recovery initially, but in November of 2009, Kado felt a sense of weakness in her shoulder and felt that it was "giving out." *Id.* at 8, Tr. 618. Dr. Seitz found that "overall, her shoulder function is quite good as is her strength," but that "it would appear she simply has very sensitive nerve endings." *Id.*

• Kado saw Dr. Mourad El-Gazzar, her primary care physician, throughout 2009 and 2010 with various complaints of pain. OTR Dated 09/14/2012 to 12/05/2012 33–48, Tr. 400–15. A physical examination in 2010 revealed a diagnosis of cervical spine pain, scoliosis of the lumbar spine, and bilateral knee pain. *Id.* at 33, Tr. 400.

• Kado continued to see Dr. El-Gazzar throughout 2011 for treatment of her spine, neck, and back pain. OTR Dated 02/23/2009 to 10/24/2012 18–32, Tr. 385–99. During a visit in May 2011, Dr. El-Gazzar reported that Kado had normal gait, 5/5 muscle strength in all major muscle groups, and normal muscle tone despite her complaints of pain. *Id.* at 27, Tr. 394.

• In January 2012, Kado saw Dr. El-Gazzar with complaints of "pain all over with no specific localization." *Id.* at 15, Tr. 382. She stated this generalized pain began two weeks prior without any apparent trigger. *Id.* Kado claimed the pain was "of almost unbearable intensity," and estimated it occurred several times daily. *Id.* Dr. El-Gazzar diagnosed Kado with generalized pain, scoliosis, cervical disc disorder, depression, chronic low back pain, and fibromyalgia. *Id.* at 16–17, Tr. 383–84.

• Kado saw her attending physician Dr. Laurence Bilfield, M.D., in July of 2012 for complaints of on-going pain as well as numbness in her right arm. OTR Dated 06/06/2012 to 06/06/2012 2, Tr. 629.

• Kado saw Dr. El-Gazzar again in August and October of 2012 for various complaints. OTR Dated 02/23/2009 to 10/24/2012 6–12, Tr. 373–79.

• The state agency physicians found only Kado's spine disorders to be severe physical impairments initially and on appeal, and they opined that Kado was capable of engaging in light work. Disability Determination Explanation. 6–8, Tr. 130-33; Disability Determination Explanation 6–8, Tr. 156–58.

**B.      Mental Impairments**

The record reveals the following facts in relation to Kado's mental impairments:

- On April 15, 2009, Kado saw Dr. El-Gazzar for complaints of pain. OTR Dated 09/14/2012 to 12/05/2012 48, Tr. 415. In connection with his examination, Dr. El-Gazzar noted Kado was "depressed, unable to focus," and that she was experiencing poor sleep and feelings of hopelessness. *Id.* He diagnosed depression. *Id.*

- In June 2009, Kado was examined and evaluated by a State Agency physician, Dr. Richard Davis, at the request of the Bureau of Disability Determination. Consultative Examination Report 2, Tr. 345. He diagnosed Kado with an adjustment disorder with mixed disturbance of emotions and conduct and borderline intellectual functioning. *Id.* at 7, Tr. 350. He noted that "[Kado] is limited in her abilities to think logically and use common sense and judgment." *Id.* at 5, Tr. 348. In the summary section of his report, Dr. Davis also found that Kado "present[s] with limitations intellectually," and is limited in her ability to relate satisfactorily to others. *Id.* at 6, Tr. 349.

- Dr. Davis also evaluated Kado in terms of the four "work-related mental abilities." He explained that,

  > This claimant's mental ability to relate to others is within the moderate range. There is more than a slight   limitation in this area but the individual is still able to have a couple people that she considers to be friends. . . .

  > The claimant's mental ability to understand, remember, and follow instructions is moderately impaired by her limitations intellectually. She is functioning within the borderline range and has problems dealing effectively with life, finding it difficult. . . .

  > The claimant's mental ability to maintain attention, concentration, persist at a task and to perform adequately is moderately limited. . . .

  > The claimant's mental ability to withstand the stresses and pressures of her day-to-day activities is moderately impaired.

  *Id.* at 7–8, Tr. 350–51.

- In April 2012, Kado was incarcerated for a probation violation. OTR 04/25/2012

-8-

to 04/30/2012 11, Tr. 362. During an initial health screening with the Cuyahoga County Sheriff's Office, Kado reported she had bipolar disorder but was not taking medication. *Id.* at 9, Tr. 360.

• Kado went to the emergency room at Southwest General Health Center in August 2012 for suicidal thoughts, depression, and agitation. Emergency Department Records Dated 07/07/2012 to 01/07/2013 22–23, Tr. 451–52.

• Throughout 2012 and 2013, Kado was treated for depression and related symptoms. OTR 09/14/2012 to 12/05/2012 4–6, Tr. 427–29; Emergency Department Records 7, 35–36, Tr. 547, 577–78.

• Kado was incarcerated again in February 2013. OTR Dated 05/02/2012 to 02/23/2013 15, Tr. 600. During an initial psychiatric evaluation, Kado reported suffering from "bipolar, depression, and anxiety" and was given medication. *Id.* at 17, 20–21, Tr. 602, 605–06.

• In April 2013, Kado was admitted to the emergency room at Southwest General Health Center because of a deliberate overdose. Emergency Department Records Dated 10/25/2011 to 09/16/2013 17, Tr. 559.

• The state-agency psychologists reviewed the record and concluded that Kado's mental impairments were not severe initially and on appeal. Disability Determination Explanation 6–7, Tr. 130–31; Disability Determination Explanation 6–7, Tr. 156–57.

## IV. Discussion

### A. Standard for Disability

A disability must exist to receive benefits under the Act. 42 U.S.C. §§ 423(a), 1382(a). Disability is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). An ALJ must follow a five-step sequential evaluation process set out in agency regulations in order to determine whether an individual is disabled under the Act. The

five steps can be summarized as follows:

> (1) First the ALJ considers whether a claimant is doing substantial gainful activity. If the claimant is doing substantial gainful activity, the claimant is not disabled.

> (2) If the claimant is not doing substantial gainful activity, the ALJ must consider whether the claimant has a severe impairment or a severe combination of impairments. If none of the claimant's impairments are severe, the claimant is not disabled.

> (3) At the third step, the ALJ must consider whether the claimant has an impairment that meets or equals a listed impairment in appendix 1, subpart P of 20 C.F.R. part 404. If an impairment meets or equals a listing, the claimant is presumed disabled without further inquiry.

> (4) If an impairment does not meet or equal a listed impairment, the ALJ must then assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents them from doing past relevant work. If the claimant's impairment does not prevent them from doing past relevant work, the claimant is not disabled.

> (5) At the last step, the ALJ considers whether the claimant is capable of performing other work that exists in significant numbers in the national economy considering the claimant's residual functional capacity, age, education, and work experience. If the claimant is capable of performing other work that exists, the claimant is not disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Under this five-step sequential evaluation process, the claimant has the burden of proof in Steps One through Four. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 652 (6th Cir. 2009). The burden shifts to the ALJ at Step Five to establish whether the claimant is able to perform other work available in the national economy. *Id.*

Additionally, in accordance with 20 C.F.R. 402.35(b), the Commissioner of Social Security publishes Social Security Rulings. "[Social Security Rulings] are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1).

Social Security Ruling (SSR) 12-2p is the applicable ruling for fibromyalgia: "This Social

-10-

Security Ruling (SSR) provides guidance on how we develop evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how we evaluate FM in disability claims and continuing disability reviews under titles II and XVI of the Social Security Act." SSR 12-2p, 2012 WL 3104869, at *1 (July 25, 2012) [hereinafter "SSR 12-2p"]. SSR 12-2p states that fibromyalgia should be analyzed under the traditional five-step evaluation process and provides binding guidance for all steps of the process that the ALJ must follow. *Id.* at *5-6.

### B. Review of the ALJ's Findings

In this case, Kado timely filed written objections to the R&R. Objs 1. Kado objects to the Magistrate Judge's affirmation of the ALJ's decision denying her benefits on two grounds. Kado alleges that the ALJ failed to properly account for her limitations in maintaining concentration, persistence, and pace in the residual functional capacity that was applied in Steps Four and Five. Objs. 2. Kado also alleges that the ALJ failed to properly consider her fibromyalgia under SSR 12-2p at Step Three of the sequential evaluation process. Objs. 4. Kado raises no objections concerning Steps One and Two of the sequential evaluation process.

### 1. The ALJ erred by failing analyze Kado's fibromyalgia in comparison to the Listing of Impairments at Step Three.

In addition to considering whether the ALJ's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the ALJ to follow the five-step sequential evaluation process and all Social Security Rules as promulgated by the agency is grounds for remand. *See, e.g., Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–416 (6th Cir. 2011) (remanding the case for further proceedings when the ALJ

failed to analyze whether the petitioner's impairments met or equaled a listing at Step Three);

*Dreher v. Comm'r of Soc. Sec. Admin.*, No. 1:15CV1412, 2016 WL 4920000, at *9 (N.D. Ohio

June 7, 2016), *report and recommendation adopted sub nom*, *Dreher, v. Colvin*, No.

1:15CV1412, 2016 WL 4939334 (N.D. Ohio Sept. 14, 2016) ("[T]his Court nevertheless finds

that remand is proper due to the insufficiency of the ALJ's Listings analysis at Step Three.").

However, remand is not necessary if the lack of analysis at Step Three is harmless. *See Forrest v.*

*Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

a.  **Was there an error?**

When following the five-step sequential evaluation process to determine whether a

claimant is disabled, at Step Three the ALJ must determine whether the claimant's impairment

"meets or equals" one of the listed impairments enumerated in appendix 1, subpart P of 20 C.F.R.

§ 404 [hereinafter "Listing of Impairments"]. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The

Listing of Impairments . . . describes impairments the SSA considers to be 'severe enough to

prevent an individual from doing any gainful activity, regardless of his or her age, education, or

work experience.'" *Reynolds*, 424 F. App'x at 414 (quoting 20 C.F.R. § 404.1525(a)).

Therefore, at Step Three the ALJ must first look to see if the claimant's impairment is

listed. §§ 404.1520(a)(4), 416.920(a)(4). Each listing specifies "the objective medical and other

findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). If the

claimant's impairment is listed, the ALJ must look at the listing and determine whether the

claimant satisfies all of the criteria to "meet" the listing. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the ALJ determines that the claimant meets the listing, the claimant will be deemed

conclusively disabled and entitled to benefits. 20 C.F.R. §§ 404.1520(d), 416.920(d).

However, if the claimant's impairment is not listed, the ALJ must determine whether the claimant's impairment is equal to one of the listings. *Reynolds*, 424 F. App'x at 414-15 ("An administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment."); §§ 404.1520(a)(4), 416.920(a). If the claimant's impairment is equal to one of the listings, the claimant will also be deemed conclusively disabled. §§ 404.1520(d), 416.920(d).

Additionally, when the claimant suffers from fibromyalgia, the ALJ must consider the guidance given in SSR 12-2p which provides,

> At step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (appendix 1). FM cannot meet a listing in appendix 1 because FM is not a listed impairment. At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.

SSR 12-2p at *6.

It is the claimant's burden to bring forth evidence at Step Three to establish that their impairments meet or are medically equivalent to a listed impairment. *See Forrest*, 591 F. App'x at 366; *Lett v. Colvin*, 2015 WL 853425, at *15 (N.D.Ohio Feb.26, 2015). However, the ALJ must properly articulate her findings to permit meaningful review at every step and "the ALJ must build an accurate and logical bridge between the evidence and [her] conclusion." *Snyder v. Comm'r of Soc. Sec. Admin.*, 210 Soc. Sec. Rep. Serv. 229, No. 5:13CV2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014) (citations omitted in original) (quoting *Woodall v. Colvin*, No.

-13-

5:12cv1818, 2013 WL 4710516, at *10 (N.D.Ohio Aug.29, 2013)).

If at Step Three the ALJ does not provide meaningful analysis in concluding whether the claimant's impairment "meets or equals" any of the listings in the Listing of Impairments, the Court may look at the ALJ's decision in its entirety to see if the ALJ made sufficient factual findings to support the conclusion at Step Three. *See Forrest*, 591 F. App'x at 366 (upholding the ALJ's Step Three findings where "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion."); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir.2006) (reasoning that there is no need to require the ALJ to "spell out every fact a second time under the step three analysis."); *Snyder*, 2014 WL 6687227, at *9 ("[I]t may be proper to consider the ALJ's evaluation of the claimed impairments at issue at other steps of his decision.").

For example, in *Reynolds*, the ALJ "began with his conclusion [that the] 'Claimant does not have an impairment or combination of impairments which, alone or in combination, meet [the Listings].'" *Reynolds*, 424 F. App'x at 415. The ALJ then went on to sufficiently analyze the claimant's mental impairments at Step Three, but provided no analysis of her physical impairments. *Id.* The court determined remand was necessary because of the ALJ's failure to conduct a Step Three analysis for the claimant's physical impairments, concluding,

> Ultimately, the ALJ erred by failing to analyze [the claimant's] physical condition in relation to the Listed Impairments. Put simply, he skipped an entire step of the necessary analysis. He was required to assess whether [the claimant] met or equaled a Listed Impairment . . . but did not do so. . . . In short, the ALJ needed to actually evaluate the evidence, compare it to [the relevant section of] the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.* at 416.

-14-

Here,[1] in regards to Kado's fibromyalgia, the ALJ's entire analysis and conclusion is as follows:

> While Social Security Ruling 12-2p addresses the method for evaluating fibromyalgia, the undersigned notes that no listing of impairment directly pertains to fibromyalgia. Accordingly, the undersigned finds that the severity of the claimant's fibromyalgia fails to meet any listing of impairment because no such listing exists.

Decision 5, Tr. 16. The ALJ correctly notes that fibromyalgia is not a listed impairment, rather unsurprisingly, as "[fibromyalgia] cannot meet a listing in appendix 1 because [fibromyalgia] is not a listed impairment." SSR 12-2p at *6. However, the ALJ's conclusion does nothing to "build an accurate and logical bridge between the evidence and [her] conclusion." *Snyder*, 2014 WL 6687227, at *10. According to Step Three and SSR 12-2p, the ALJ was required to analyze whether the Kado's fibromyalgia "meets or equals" any of the listings in the Listing of Impairments. §§ 404.1520(a)(4), 416.920(a)(4); SSR 12-2p ("At step 3, therefore, we determine whether FM medically equals a listing."). Similar to *Reynolds*, while the ALJ analyzed Kado's mental impairments at Step Three, the ALJ provided no analysis at Step Three for Kado's fibromyalgia.

Since the ALJ did not provide meaningful analysis at Step Three to support her conclusion, the Court looks at the ALJ's decision in its entirety to find support. *See Forrest*, 591

---

[1]

The Magistrate Judge declined to evaluate whether the ALJ properly compared Kado's fibromyalgia to the Listing of Impairments at Step Three. R&R 39–40. While the Magistrate Judge concluded Kado's argument was raised for the first time in her Reply, Doc #: 14, the Court respectfully disagrees. While Kado expanded upon her argument in her Reply, Kado alleges on page thirteen of her Brief on the Merits, Doc #: 12, that "the ALJ did not fully evaluate Ms. Kado's fibromyalgia consistent with SSR 12-2p after determining there was no applicable Listing."

F. App'x at 366. However, even upon looking at the broader decision, the Court finds no analysis in the ALJ's decision making a medical equivalency determination for fibromyalgia.

Therefore, by failing to follow Step Three and the guidance established in SSR 12-2p, the ALJ did not follow proper legal standards. Since the ALJ did not apply proper legal standards, there is an error that may require remand.

### b. Does this error warrant remand?

An ALJ is not required to "address every listing" or "to discuss listings that the applicant clearly does not meet." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (citations omitted). However, "where the record raises a 'substantial question' as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment." *Madden v. Colvin*, No. 5:14CV1461, 2015 WL 3646225, at *13 (N.D. Ohio June 10, 2015); *see also Forrest*, 591 F. App'x at 366; *Smith–Johnson*, 579 F. App'x at 432. As the claimant has the burden of proving that they meet a listing at Step Three, "the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432. Thus, "the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the *correct procedure*, could have resolved the factual matter in another manner." *Madden*, 2015 WL 3646225, at *15 (emphasis added) (citations omitted).

In *Reynolds*, for instance, the Sixth Circuit found that the ALJ's error was not harmless because if the ALJ properly analyzed Step Three and found that the claimant met a listing, the

-16-

claimant would have been entitled to social security benefits. *Reynolds*, 424 F. App'x at 416. The Court concluded, "Additionally, in this case, correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence [the claimant] put forth could meet this listing." *Id.*

Under certain circumstances, "some courts have examined the record to determine whether the same disability outcome would have resulted had the ALJ expressly compared the evidence to the listings. These courts have proceeded cautiously, however." *Dodson v. Colvin*, No. 3:15CV0497, 2016 WL 541471, at *15 (N.D. Ohio Feb. 11, 2016). Furthermore, courts within this district have frequently vacated and remanded cases where the ALJ provided only a conclusory statement and failed to conduct a meaningful analysis at Step Three comparing the medical evidence to the Listing of Impairments. *See e.g., Dodson*, 2016 WL 541471, at *17; *Madden*, 2015 WL 3646225, at *18; *Saleh v. Comm'r of Soc. Sec.*, 191 Soc. Sec. Rep. Serv. 595, 2013 WL 3421835, at *8 (N.D.Ohio July 8, 2013).

Here, the ALJ determined at Step Two of the sequential evaluation process that Kado suffered from severe impairments of fibromyalgia. Decision 4–5, Tr. 15–16. The ALJ states, "The undersigned further finds that the credible evidence of record establishes that fibromyalgia has imposed more than a minimal limitation on the claimant's ability to perform basic work activities, and it is therefore 'severe.'" *Id.* at 5, Tr. 16. Since the ALJ determined Kado's fibromyalgia was severe as supported by credible evidence, the Court is unwilling to conclusively find that Kado's fibromyalgia does not equal a listing at Step Three, as the ALJ concluded without meaningful explanation. Even though Kado does not specify which listed impairment her fibromyalgia is equal to, since the ALJ determined Kado's fibromyalgia is severe, there may be a

"substantial question" as to whether Kado's fibromyalgia equals an impairment, and therefore, the Court declines to make findings best left to the expertise of the ALJ.

In reviewing the decision as a whole, the ALJ decision deprives the Court of the ability to conduct a meaningful review as to whether Kado's fibromyalgia "meets or equals" a listed impairment at Step Three. The Court finds that the ALJ failed to thoroughly evaluate Kado's fibromyalgia and compare it to the Listing of Impairments as required by Step Three and SSR 12-2p, and a failure to do so is an error. Because the Court cannot discern the reasons for the ALJ's decision regarding fibromyalgia at Step Three, remand is necessary to allow the ALJ to engage in and provide a more thorough Step Three analysis comparing Kado's fibromyalgia to the Listing of Impairments. Accordingly, Kado's second objection is sustained, and the Court declines to adopt the R&R as to the ALJ's consideration of Kado's fibromyalgia at Step Three.

> **2. The ALJ properly accounted for Kado's moderate limitations in maintaining concentration, persistence, and pace in the residual functional capacity.**

Kado here argues that the ALJ failed to properly account for her limitations in maintaining concentration, persistence, and pace in the residual functional capacity (RFC) that was applied in Steps Four and Five of the five-step sequential evaluation process to determine whether an individual is disabled under the Act.[2] Objs. 2.

Before the ALJ goes from Step Three to Step Four, the claimant's RFC is assessed.

---

[2]
   If, upon reconsideration, the ALJ finds at Step Three that Kado's impairments are equivalent to a listing on the Listing of Impairments, the ALJ of course need not continue to Steps Four and Five. However, because it is also possible the ALJ will not find such an equivalent impairment, the Court presently addresses Kado's Step Four and Five objection.

§§ 404.1520(a)(4), 416.920(a)(4). The RFC "is the most you can still do despite your limitations." 20 C.F.R. §§ 404.1545, 416.945. The final responsibility for deciding the RFC is reserved to the Commissioner. 20 C.F.R. § 416.927(d)(2). "As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence." *Kline v. Astrue*, No. 1:12-CV-01802, 2013 WL 1947164, at *3 (N.D. Ohio Apr. 17, 2013), *report and recommendation adopted sub nom*. *Kline v. Colvin*, No. 1:12 CV 1802, 2013 WL 1946201 (N.D. Ohio May 9, 2013) (citing 20 C.F.R. § 416.946(c)). "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (citations omitted). While the RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that are considered in assessing the RFC. *See Rabbers*, 582 F.3d at 652 ("The claimant bears the burden of proof through step four; at step five, the burden shifts to the Commissioner."); *Her*, 203 F.3d at 391.

Here, Kado accepts that "the residual functional capacity may account for [her] moderate difficulties with pace" but contends that "there are no accommodations included that would account for [her] accepted limitations in maintaining concentration and persistence." Objs. 3.

Kado relies on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (2010), in support of her argument that the RFC fails to adequately account for her moderate limitations in concentration, persistence, and pace. In *Ealy*, the ALJ concluded that the claimant had moderate difficulties with regard to concentration, persistence or pace, but the ALJ failed to provide the vocational expert with a fair summary of those conclusions when asking hypothetical questions to determine

-19-

whether the claimant is capable of performing other work that exists at Step Five. *Ealy*, 594 F.3d at 516. The hypothetical question asked in *Ealy* by the ALJ limited the claimant to "simple, repetitive tasks and instructions in non-public work settings." *Id.* at 510. The Sixth Circuit determined that the ALJ's hypothetical question was inadequate to convey the claimant's limitations because it omitted the speed and pace based restrictions. *Id.* at 516.

Generally, however, RFC limitations to simple, routine work adequately address the issues of concentration and persistence. *See Dultmeyer v. Comm'r of Soc. Sec.*, No. 3:12 CV 2941, 2014 WL 991900, at *18 (N.D. Ohio Mar. 13, 2014) ("The RFC limits [the claimant] to simple, routine work which adequately addresses the issues of concentration."); *Kline*, 2013 WL 1947164, at *5 (explaining that the claimant's limitations in concentration and persistence were satisfied when the RFC limited the claimant to "simple, routine, repetitive, one or two step tasks."). Furthermore, in *Foreman v. Colvin*, 2013 WL 3200615 at *13 (N.D. Ohio June 24, 2013), the court found *Ealy* distinguishable because the hypothetical question included a pace-based restriction in addition to a limitation to simple, routine tasks. The court explained that "the hypothetical question accounted for [the claimant's] moderate limitations in concentration, persistence, and pace by limiting her to 'simple and routine tasks, but not in a fast-paced production environment, such as on an assembly line.'" *Foreman*, 2013 WL 3200615 at *13 (emphasis omitted).

In this case, *both* the ALJ's hypothetical question to the vocational expert and the RFC limited Kado not only to "simple, repetitive tasks commensurate with unskilled work," but also to work "with superficial interaction with others meaning of a short duration and for a specific purpose; with no fast pace or high production quotas and with infrequent change where changes

can easily be explained." Decision 6, Tr. 17; Transcript of Oral Hearing 47–48, Tr. 74–75. The language used in Kado's RFC is similar to the RFC and hypothetical question language used in *Dultmeyer*, *Kline*, and *Foreman*, where it was found that such language adequately accounted for moderate limitations in concentration, persistence, and pace.

   The ALJ also provides an indication of the evidence upon which she relied in determining Kado's RFC. For example, the ALJ considered Kado's school records and recounted the medical evidence regarding Kado's mental impairments. Decision 7–9, Tr. 18–20. The ALJ also gave significant weight to Psychologist Richard Davis' opinion who opined that "[Kado] is able to get along with others, she is able to provide a detailed history and respond to questions, she is able to care for her children, and has some difficulty responding to stress in an appropriate manner." *Id.* at 9, Tr. 20.

   Despite Kado's generalized conclusions to the contrary, Kado fails to provide any specific details about, or examples illustrating how, the restrictions the ALJ set forth in the RFC, taken as a whole, fail to adequately account for her moderate limitations in concentration, persistence, and pace. Kado also fails identify any additional restrictions that she feels should have been included in the RFC.

   Thus, unlike *Ealy*, both the hypothetical and the RFC in the instant case contain appropriate concentration, persistence, and pace based restrictions. The ALJ indicated the evidence upon which she relied and properly accounted for Kado's moderate limitations in maintaining concentration, persistence, and pace in Kado's RFC. Accordingly, Kado's first objection is overruled, and the Court adopts the R&R as to the RFC assessment.

**IV.    Conclusion.**

For the reasons set forth above, the Court ADOPTS IN PART the R&R insofar as it affirms the Administrative Law Judge's assessment of Kado's residual functional capacity. However, the Court VACATES the decision of the Administrative Law Judge in assessing whether Kado's impairments meet or equal a listing at Step Three. Thus, the Court REMANDS the case to the Social Security Administration for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

*/s/ Dan A. Polster   October 17, 2016*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

-22-